UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION NO. 06-501 (MLC) |
| v. | : | |
| | : | |
| AARON FOGLE, | : | **MEMORANDUM OPINION** |
| | : | |
| Defendant. | : | |
| | : | |

**COOPER, District Judge**

A grand jury returned a one-count indictment charging that on or about November 5, 2005, defendant Aaron Fogle, having previously been convicted of a felony, knowingly possessed a loaded 45 caliber handgun, in violation of 18 U.S.C. §§ 922(g)(1) and 2.  Defendant has filed an omnibus motion seeking, <u>inter alia</u>, to (1) suppress and preclude from introduction at trial any evidence obtained as a result of the stop of the car he was driving on November 5, 2005; (2) suppress his statement to law enforcement officers after their recovery of the firearm; and (3) dismiss the indictment.  The Court conducted a two-day evidentiary hearing, and has considered the arguments of the parties in their briefs and oral argument.  For the reasons stated herein, the motion is denied.[1]

_____

[1]  The documents of record pertinent to this motion, cited by docket entry number where available ("dkt.") are:  defendant's moving brief (dkt. 10); government's opposition brief (dkt. 12); defendant's supplemental  brief (dkt. 17); government's supplemental brief (dkt. 16); transcript of evidentiary hearing 4-19-07 ("tr. 15"); and hearing exhibits admitted into evidence ("exh.").  Neither party has ordered a transcript of the second day of the hearing, so we will cite to that testimony as "5-3-07

## I.  FINDINGS OF FACT

The Court finds the following facts, based upon the testimony of witnesses and exhibits received in evidence.

The City of Trenton Police Department maintains a communications department staffed with personnel who receive communications from the public and from department officers, and who dispatch officers to respond in the field ("radio room"). Radio room personnel make typed entries into computerized log forms as they perform their duties ("CAD records"). (5-3-07 test.)

CAD records for Saturday, November 5, 2005, indicate that the radio room received a 911 call at 1:49:44 a.m. from an anonymous caller on a specified cell phone number, reporting that a "male inside Green Ford Expedition pulled a gun," and the location was Dee Dee's Lounge. (Exh. D-2 at 4.)  Timothy Dickson, Jr., the Call Taker who received the call, typed that information into the CAD records, also typing computer data giving the exact street address of Dee Dee's Lounge as 549 Brunswick Avenue between Chase Street and East Paul Avenue.  The Call Taker recorded that he electronically transmitted that information to the dispatchers at 1:50:43.[2]  (Id.; 5-3-07 test.)

---

test.")  We have corrected obvious typographical errors in quoting transcript testimony, but no corrections have been made to the content of the testimony.

[2]  There were two dispatchers in the regular dispatch unit that night, and a third dispatcher at another location assigned to undercover communications.  All three dispatchers typed

Dispatcher Michael Kramarz, who testified at the hearing, was listed in the CAD records as the dispatcher for that incident.[3]  When he received the transmission from the Call Taker, he looked on his board to see what police units were shown as available in the area, and radioed several of them with instructions that they were "dispatched" to the incident.  (5-3-07 test.)  His entries into CAD records show that his first dispatch call, at 1:51:36, was to Unit B4E (officers Capasso and Charles), operating as a two-man motorized unit.  He also dispatched as backup units, at 1:52:06, Unit B67 (officers Doherty and Jefferson), and Unit B30, Sergeant Gonzales.  (Exh. D-2 at 9.)  He stated that all 911 calls and radio room transmissions are routinely tape recorded, but they are normally retained for only 90 days.  (5-3-07 test.)[4]

Officer David Godbold ("Godbold"), who also testified at the hearing, is a police officer with the City of Trenton in the rank

---

various inputs to the CAD records for this incident.  Some of those entries bear the dispatcher's employee number and other entries do not.  This does not reflect any irregularity in procedure; it is simply how the CAD records are generated by the on-duty communications personnel.  (See exh. D-2; 5-3-07 test.)

[3] Each incident that begins with a call from the public or from the police receives an incident number, sequentially through the calendar year.  This incident was number 05-151127, and all CAD records for the incident are marked with that number.  (Exh. D-2; 5-3-07 test.)

[4] The government has informed the Court that the tape recordings of the 911 call and radio room communications relevant to this case are not available.

of patrolman, with 24 years of experience in the Trenton Police Department and commensurate training.  In the early morning hours of Saturday, November 5, 2005, he was on duty in the Trenton North District Patrol Unit as a one-man motorized patrol unit, Unit B53N.  His shift began at 10:00 p.m. on Friday, November 4, 2005.  He was wearing full police uniform and driving a marked police car.  His duties when on patrol were generally to patrol in high crime areas, responding to troubled neighborhoods and general neighborhood safety matters, and take and write reports. (Tr. 15 at 3-6, 66.)

Godbold was on duty on Nassau Street in the vicinity of Dee Dee's Lounge, having just issued a parking violation summons, when he heard the radio room broadcast its dispatch of a two-man police unit to Dee Dee's Lounge on a report of a man with a gun. (Id. at 7-8; 5-3-07 test.; exh. G-21A.)  Godbold recalled that the dispatch broadcast was that a man had pointed a gun at the caller and was now inside a green Ford Expedition that was parked opposite Dee Dee's Lounge.  (Id. at 7-8, 50-53.)  Godbold responded because, although he was a one-man unit, he was close by the scene and it was a gun call.  (Id. at 7-8; 5-3-07 test.) He said that several police units commonly respond to a gun call, for added protection of the officers.  (5-3-07 test.)  Godbold knew from police radio transmissions that the two-man unit was also responding, and he went as back-up.  He radioed the

4

dispatcher and said that he was proceeding there as back-up.

(Tr. 15 at 7-8; 5-3-07 test.)[5]

---

[5]   The CAD records do not contain an entry for a
transmission from Godbold to the radio room to inform them that
he was responding at about 1:52 a.m.  (See exh. D-2 at 5, 9.)
Godbold testified that he did radio that information to the radio
room at the time he responded.  (Tr. 15 at 7-8; 5-3-07 test.)
His motor patrol log entries, written in his handwriting, show
that he completed writing the vehicle summons at 1:51; received
the radio call at 1:51; and arrived at the scene (namely, Dee
Dee's Lounge) at 1:52.  (Exh. G-21A.)  He testified that he did
arrive at that location at approximately 1:52.  (5-3-07 test.)

   Kramarz testified that multiple police units, such as four
or five, typically respond to a gun possession call, and
dispatchers may show their presence in the CAD records later,
when they tell the dispatchers they have responded.  (5-3-07
test.)  Godbold is shown in the CAD records as having been
dispatched as backup at 1:59:23 and "arrived" at 1:59:32.  (Exh.
D-2 at 9.)  However, that would place Godbold at Dee Dee's Lounge
at a time just seconds before the arrest was recorded (at a
location three blocks away) at 1:59:39.  (Exh. D-2 at 5.)

   We find Godbold's account of his activities and the
approximate timing of those activities to be credible, and do not
find this discrepancy in the CAD records to be dispositive.  As
the testimony of Kramarz indicated, the CAD records are manually
created by a team of dispatchers, each performing multiple
simultaneous tasks.  (5-3-07 test.)  In addition, he testified
that the only data that is received by computer, after the
transmission from the Call Taker, is the information about time
and identity of police unit, but it is up to the dispatcher to
type that data and any incoming radio information into the CAD
record.  (Id.)  It is clear from his testimony that not all field
transmissions are captured in the CAD reports.  He testified
specifically, for example, that it is normal for the sergeant in
charge of an incident to designate the first responding unit to
be the "prime unit" to prepare the incident report, and the fact
that Godbold was so designated as events unfolded, and worked
nine more hours on the case that day, indicated to Kramarz that
Godbold was first on the scene.  He said that based on the CAD
records, Godbold could very well have been the first officer
responding at the bar and could have made the subsequent vehicle
stop on Nassau Street.  (Id.)  See n.6 infra and accompanying
text.

The police radio dispatch specified that the scene was Dee Dee's Lounge at 549 Brunswick Avenue.  Godbold was familiar with that location.  Dee Dee's Lounge is a neighborhood bar.  "We had some problems there, so we had to respond for various disturbances in the past."  (Tr. 15 at 8-9.)  The area surrounding that bar "could be" a "rough neighborhood."  (Id. at 80.)

Godbold was the first police car to arrive at the specified location.  Dee Dee's Lounge occupies the corner of Brunswick Avenue and Chase Street, with a front entrance on Brunswick and a side entrance on Chase.  As Godbold drew his car up to the front entrance, he observed a green Ford Expedition ("Ford") parked on Chase Street opposite the side entrance.  Godbold could see a driver and a passenger in the front seat, but he could not see their physical characteristics.  He testified:  "At that time an older black gentleman came out of the bar and pointed in the direction of the green Ford Expedition, at which time the vehicle stated to pull away from the bar."  (Id. at 9-10.)  When Godbold's car came behind the parked and stationary Ford, the Ford started to pull away at the same time that the man came out and pointed out the Ford to Godbold.  The man said something Godbold could not hear, but the man "pointed indicating that that's the vehicle."  (Id. at 10.)  Godbold believed the man "meant that that's the vehicle that we were there for."  (Id.)

Godbold then started to follow the Ford as it proceeded
north on Chase Street (a one-way street approximately two blocks
long) for a minute or two, then right onto East Paul.  At that
time Godbold activated his flashing overhead police lights but
not his siren, to conduct a stop of the Ford.  He did that
because he heard the sirens of approaching police units.  The
Ford responded by immediately turning left onto Nassau Street and
stopping at the corner of East Paul and Nassau.  (Id. at 11-16;
exh. G-11, G-12.)

There are CAD entries as follows:

1:53:04          VEH ON CHASE APPROACHING E PAUL TOWARDS
                 BRUNSWICK

1:53:20          PULLING OVER ON NASSAU ST.

(Exh. D-2 at 5.)  Those entries, typed by an unattributed
dispatcher in the radio room, do not indicate which police unit
radioed in that information.  Godbold testified that those were
his radio broadcasts, which he sent as he was following the Ford
up Chase Street, onto East Paul, and to the point of the police
stop on Nassau Street.  (5-3-07 test.)  We find that those
broadcasts were issued by officer Godbold.

Godbold pulled his vehicle up behind the Ford, which was
stopped on Nassau Street.  The driver exited the Ford and started
to approach Godbold, who was still in his police car.  (Tr. 15 at
16.)  The area of the stop was well-lit by street lights that
night.  (Id. at 23-24.)  At the point when the driver exited the

7

vehicle, Godbold could see the driver.  Godbold identified the driver at the hearing as defendant, Aaron Fogle.  (Id. at 24.) Using his PA system while still seated in his police car, Godbold asked Fogle to have a seat back into his vehicle; that is, he ordered Fogle back into the Ford.  (Id. at 16-17; 24-25.)  The driver complied with that order.  (Id. at 73-74.)  Godbold did that because the Ford had two occupants, and Godbold wanted to keep them together until the other police units arrived.  Also, Godbold wanted to put his search light on the Ford, so he did activate that light along with his still-flashing overhead lights.  (Id. at 25.)  Godbold did not approach the Ford alone, and by then the other police units had arrived.  (Id. at 25-26.)

Three responding police units joined Godbold at that location.  Sergeant Gonzales came in one police vehicle; Detective Davis came in his K-9 vehicle; and officers Capasso and Charles were a two-man unit in a police wagon.  The two-man unit of Capasso and Charles was the unit that was originally dispatched to respond.  (Id. at 26-27.)[6]

---

[6]  The hearing testimony of Sergeant Gonzales corroborated details of Godbold's testimony.  Gonzales testified that he also was near the Dee Dee's location when the dispatch message went out, and he responded right behind Godbold's vehicle as they approached the bar.  He said that he, too, saw the black male in front of the bar door pointing at a green truck that was parked but then moved down Chase Street, followed by Godbold.  At that point Gonzales heard Godbold broadcast over the police radio that Godbold was pursuing the green truck, and he saw Godbold doing that.  He also saw Godbold pull over the green vehicle on Nassau Street off East Paul.  (5-3-07 test.)  These events occurred in

Once all of the officers were there, Godbold approached the Ford at its passenger side front door.  He opened the car door and told the passenger to show his hands and got him out of the Ford, then placed the passenger against the car in a frisk position and frisked him.  Godbold did that because there was a report of a gun in a vehicle.  The frisk was to check a suspicious person or a suspect for any type of weapon.  (<u>Id.</u> at 31-32.)  He found no weapon on the passenger.  Godbold described him as a white male, but recalled no other physical characteristics.  Godbold then directed the passenger to go towards the rear of the Ford, where officers Charles and Capasso received the passenger.  (<u>Id.</u> at 32.)

After the passenger was passed off to officers Charles and Capasso, Godbold looked inside the Ford on the passenger side, where he was standing, and he saw a black shoulder holster on the front passenger side floor.  (<u>Id.</u> at 32.)  "[I]t was sticking out from under the seat.  You could see it in plain view....  [T]he door was open, so the interior lights was on, and I could see the

---

split-second succession.  We do not find Gonzales's account of having followed Godbold's vehicle to be inconsistent with Godbold's recollection that at the very moment the Ford pulled over and stopped on Nassau Street, Gonzales and the other police units had not yet pulled up alongside Godbold's vehicle. Godbold's attention at that moment would have been primarily on the driver of the Ford, whom Godbold was ordering back into his vehicle.  As Godbold testified, by the time Godbold ordered Fogle back into the Ford, Gonzales and the other police units had arrived and parked in an array at that location.  (Tr. 15 at 25-27.)

holster sticking out from under the seat." (Id. at 36.)  Godbold
picked up the holster, and saw nothing inside the holster.  He
advised Sergeant Gonzales and Detective Davis that he had found a
holster.  (Id. at 36-37.)  Then he began looking under the seat
for a weapon.  Detective Davis, who was on the driver's side of
the Ford, also began looking under the seat for a weapon, and he
announced that he had found a weapon.  (Id. at 37, 77.)  At that
point the driver, Fogle, was still in the frisk position against
the Ford towards the rear of the Ford, having been ordered out of
the car and frisked by another officer.  (Id. at 37-38, 74-75.)
Neither Fogle nor the passenger was in handcuffs when the weapon
was found.  (Id. at 38.)  Detective Davis handed the weapon to
Godbold at the driver's side door, after the weapon was
"cleared."  (Id.)

According to Godbold's testimony, the following next
occurred:

Q:   Did the driver – did the defendant say anything at
     all at this time?

A:   Yes, he was looking at the whole incident.  He
     watched Davis bring the gun out and clear it, and
     at that point he made the statement to me that
     it's his, that he was in the armed forces or armed
     service, he was in the military, and he – the gun
     was his, but he didn't have a permit.

Q:   But he didn't have a permit?

A:   That's the way he told me.

Q:   What was his tone when he made those comments to
     you?

A:   Matter of factly.

Q:   ... [W]ere they in response to any questions by
     you?

A:   No, I didn't ask him anything.

Q:   Okay, but ... he wasn't in handcuffs.  Is that
     right?

A:   Not at that point, no.

(Id. at 38-39.)

Godbold observed that after the gun was discovered and Fogle
made that statement, Fogle and the passenger were both
handcuffed, and under the authority of Sergeant Gonzales they
were conveyed to police headquarters.  Godbold did not ask Fogle
his name at the scene of the arrest.  Godbold asked Fogle his
name when Godbold got to the police station and started preparing
the incident investigative report.  (Id. at 40, 45-47.)  Sergeant
Gonzales had changed "prime unit" designation from Capasso and
Charles to Godbold because Godbold was first at the scene and
initiated the arrest.[7]

---

[7] Godbold testified that he recalled being designated
"prime unit" by Sergeant Gonzales, but did not at the time of the
hearing recall when he received that designation.  (Tr. 15 at 78-

11

Godbold stated that Detective John Delli of the same police department wrote the charging documents.  Godbold recalled that Fogle was charged with terroristic threats, possession of a weapon, possession of a weapon for unlawful purpose, and (he believed) aggravated assault.  (Id. at 41-42.)[8]  He said that the charges were based on the recovery of the weapon and on the statement of the victim, who was interviewed by Godbold:

> Q:  So the victim was later interviewed?
>
> A:  Yes.
>
> Q:  Okay, and she was able to identify the defendant?
>
> A:  Yes, I went back to Dee Dee's Lounge, and she was
>     called and responded back to that scene.

(Id. at 42.)

The police dispatch record notes that the 911 call was by an anonymous caller, but a telephone number was obtained as part of the 911 call.  (D-2 at 4, 5.)  Kramarz, the dispatcher, testified that in this instance the telephone number was a cell phone, and

---

81; 5-3-07 test.)  The CAD records indicate that prime unit designation was changed to Godbold at 2:18:18.  (Exh. D-2 at 5.) Sgt. Gonzales testified that he assigned Godbold to become the primary unit for several reasons, including that Godbold was the first officer to respond, Godbold had a lot of visual information, and he effectuated the vehicle stop.  (5-3-07 test.)

[8]  The Investigation Report, written by Godbold and approved by the signature of Sgt. Gonzales, states that defendant was booked by Det. Delli on three state charges:  (1) Terroristic threats, N.J.S.A. 2C:12-3.b.; (2) Possession of weapons for unlawful purposes, N.J.S.A. 2C:39-4.a.; and (3) Unlawful possession of weapons, N.J.S.A. 2C: 39-5.b.  (Exh. D-1 at 1.)

showed as caller identification information when the 911 call
came into the police station.  (5-3-07 test.)  That same number
is listed as the cell phone number of the victim, whose name and
three phone numbers appear on Godbold's investigative report.
(Tr. 15 at 95; exh. D-1 at 1.)

## II. DISCUSSION

Defendant's suppression motion hinges on the
constitutionality of the investigatory stop of his vehicle under
the "reasonable suspicion" standard of Terry v. Ohio, 392 U.S. 1
(1968) and its progeny.  (Def. Br. at 10.)[9]  The parties do not
dispute that on this issue the government bears the burden of
proof by a preponderance of the evidence.

"[T]he 'reasonable suspicion' inquiry is highly fact-
dependent in nature."  United States v. Goodrich, 450 F.3d 552,
553 (3d Cir. 2006).  As the Supreme Court has recently emphasized,
"in the end we must ... slosh our way through the factbound
morass of 'reasonableness.'"  Scott v. Harris, No. 05-1631, 2007
WL 1237851 (U.S. 2007) (determining reasonableness of the manner
in which Fourth Amendment seizure of individual was effected, for
purposes of qualified immunity analysis in § 1983 action).

---

[9]     Defendant further contends that the police search of the
passenger compartment of the vehicle, and the statements made
by defendant after discovery of the gun, must also be suppressed
and thus the indictment must be dismissed.  (Def. Br. at 10-12.)
We will reach those arguments after discussing the initial
vehicle stop.

The Fourth Amendment prohibits "unreasonable searches and seizures...." U.S. Const. amend. IV. "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be effectuated with a warrant based on probable cause." United States v. Robertson, 305 F.3d 164, 167 (3d Cir. 2002). However, under the "narrowly drawn" exception to the warrant requirement established in Terry, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). This rule applies whether the criminal activity is ongoing or has already been completed. See Goodrich, 450 F.3d at 553 (crime in progress); United States v. Brown, 448 F.3d 239, 244 n.7 (3d Cir. 2006) (completed felony). Any evidence obtained pursuant to an investigative stop that does not comply with the Terry standard must be suppressed as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471, 487-88 (1963).

We must begin the analysis by determining when the seizure of defendant occurred, because that is the moment when "the Fourth Amendment becomes relevant." Terry, 392 U.S. at 16. We must consider only "the facts available to the officer at the moment of the seizure." Id. at 21-22. "The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search." Florida v. J.L., 529 U.S.

14

266, 271 (2000).  "[I]nformation acquired subsequent to the initial seizure cannot retroactively justify a <u>Terry</u> stop." <u>Goodrich</u>, 450 F.3d at 559 (citations omitted).

"[A] Fourth Amendment seizure [occurs] ... when there is a governmental termination of freedom of movement through means intentionally applied." <u>Brower v. County of Inyo</u>, 489 U.S. 593, 596-97 (1989).  A seizure occurs when there is either (a) "a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful," or (b) submission to a "show of authority." <u>Brown</u>, 448 F.3d at 245 (quoting <u>California v. Hodari D.</u>, 499 U.S. 621, 626 (1991)).  We find that in this case a Fourth Amendment seizure of defendant occurred when the Ford vehicle pulled over and stopped on Nassau Street in response to police lights, and defendant complied with the police directive over the PA system that he remain in the vehicle.

The familiar precepts governing the "reasonable suspicion" standard have been summarized by the Third Circuit as follows:

> Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>United States v. Cortez</u>, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).  An officer's objective basis for suspicion must be particularized because the "demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence." <u>Terry</u>, 392 U.S. at 22 n.18, 88 S.Ct. 1868.  At the same time, we must allow "officers to

15

> draw on their own experience and specialized training
> to make inferences from and deductions about the
> cumulative information available to them that might
> well elude an untrained person." United States v.
> Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d
> 740 (2002) (internal quotation marks omitted); see also
> United States v. Nelson, 284 F.3d 472, 476 (3d Cir.
> 2002) ...  In evaluating whether there was an objective
> basis for reasonable suspicion, we consider 'the
> totality of the circumstances – the whole picture.'
> Cortez, 449 U.S. at 417, 101 S.Ct. 690.

Brown, 448 F.3d at 241.

The Supreme Court has held "the determination of reasonable suspicion must be made on common sense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125.  "The 'reasonable suspicion' analysis is objective; subjective motive or intent is not relevant for Terry purposes." Goodrich, 450 F.3d at 559.

"A reasonable suspicion may be the result of any combination of one or several factors:  specialized knowledge and investigative inferences ..., personal observation of suspicious behavior ..., information from sources that have proven to be reliable, and information from sources that -- while unknown to the police -- prove by the accuracy and intimacy of the information provided to be reliable at least as to the details contained within that tip." United States v. Nelson, 284 F.3d 472, 478 (3d Cir. 2002) (internal citations omitted).  "[T]he essence of all that has been written is that the totality of the circumstances -- the whole picture -- must be taken into account.

16

Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." <u>Cortez</u>, 449 U.S. at 417-18.

It is well settled that reasonable suspicion can be based on information received from another person. <u>Robertson</u>, 305 F.3d at 168, citing <u>Adams v. Williams</u>, 407 U.S. 143, 147 (1972). The Third Circuit has quoted with approval, even in the wake of the most recent Supreme Court decisions involving <u>Terry</u> stops based on "tips," the following Supreme Court guidance:

> Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability. One simple rule will not cover every situation. Some tips, completely lacking in indicia of reliability, would either warrant no police response or require further investigation before a forcible stop of a suspect would be authorized. But in some situations -- for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime -- the subtleties of the hearsay rule should not thwart an appropriate response ....

<u>Nelson</u>, 284 F.3d at 479, quoting <u>Adams v. Williams</u>, 407 U.S. 143, 147 (1972).

There are a wide range of factors that can be relevant in evaluating the totality of the circumstances under <u>Terry</u>. Those include: (1) the reputation of the area in which the stop occurred for criminal activity; (2) the time of day; (3) the geographical and temporal proximity of the stop to the scene of

an alleged crime; (4) the number of persons in the area;[10] (5)
whether, even if anonymous, the informant(s) communicated by
telephone call or in person to officers;[11] (6) the timing,
quality and content of the information communicated by
informants;[12] (7) any exigent circumstances at the time;[13] and (8)

---

[10]   These four factors were cited as factually relevant in
upholding a Terry stop in Goodrich, where a known informant
telephoned police with a report of suspected theft in progress in
a high crime area, but provided no detailed description of the
two suspects or their vehicle, and police stopped defendant's
vehicle within seven minutes in the immediate vicinity, late at
night and without other occupied vehicles nearby. Goodrich, 450
F.3d at 561-63.

[11]   Many cases have recognized a spectrum of possible
reliability of tips from known informants, anonymous in-person
informants and anonymous telephone calls, generally viewing those
in descending order but not ruling out any as possibly reliable
in the totality of circumstances. See, e.g., Nelson, 284 F.3d at
482-85 (911 call from a wholly anonymous caller reporting current
criminal activity would not have been sufficiently reliable
alone, but similar call from anonymous informant on private
police informant line demonstrating "inside" nature of
information and urgency, as well as robbery victim status, and
detailed description of vehicle and locality, provided sufficient
reliability); United States v. Valentine, 232 F.3d 350, 352-55
(3d Cir. 2000) (anonymous informant, who refused to identify
himself, flagged down police at 1:00 a.m. in high crime area and
reported he had just seen a man with a gun, giving detailed
physical description; held sufficient where officers could assess
informant's credibility as he spoke and knew what he looked like
and had some opportunity to find him if the tip did not pan out).

[12]   See, e.g., cases cited and discussed supra, nn.10, 11.

[13]   The Third Circuit in Robertson placed some weight on the
factor that circumstances were immediately unfolding and police
officers were called upon to take quick, decisive action to make
investigatory stops of persons who might otherwise disappear from
the area.  For example, a Terry stop in Robertson was upheld in
circumstances where field officers responded to a police radio
call that officers were already pursuing two male robbery

18

the behavior of defendant when police came into his vicinity, even if lawful conduct.[14]  Where, however, a tip is one of the principal reasons for the police stop, "the content of the tip ... must provide a particularized and objective basis for suspecting (1) the particular persons stopped (2) of criminal

---

suspects on the run (described only as African-American, with basic clothing descriptions), one allegedly armed.  The arresting officer saw what he thought were the suspects running, but lost sight of them.  Next, a "bystander" driving a van pulled up to the police vehicle and told the officers that the two men they were "looking for" had just boarded a certain bus several blocks away.  The officers chased the bus and boarded it, finding two men matching the dispatch description.  Although the Court did use the term "hot pursuit," the basis of the decision was the totality of the described circumstances including the exigencies of the situation.  The Court held that the circumstances supported the Terry stop of defendant leading to his conviction as a felon in possession of ammunition, even though he was not ultimately identified by the victim as the armed robber. Robertson, 305 F.3d at 165-70.

[14]   The Valentine Court, in evaluating the totality of the circumstances, took into account that defendant and the two men with him immediately began walking away from the police patrol car when it arrived.  The Court stated:

> Walking away from the police hardly amounts to the headlong flight considered in Wardlow and of course would not give rise to reasonable suspicion by itself, even in a high-crime area, but it is a factor that can be considered in the totality of the circumstances.
> ....
> [W]e conclude that the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw Valentine and his two companions walk away as soon as they noticed the police car.

232 F.3d at 357.

activity."  Goodrich, 450 F.3d at 560, citing J.L., 529 U.S. at
272.

Those cases in which tips were found insufficient to provide
reasonable suspicion for a Terry stop have looked to these same
factors but found the reasonable suspicion standard inadequately
met in the factual circumstances presented.  The leading example
is found in the Supreme Court's decision in J.L., where an
anonymous caller reported to police that a young black male
standing at a particular bus stop was wearing a plaid shirt and
carrying a gun.  At an undetermined time after the police station
received that call, two officers were instructed to respond.
They arrived at the bus stop about six minutes later and saw
three black males "just hanging out [there]," one of whom was
wearing a plaid shirt.  J.L., 529 U.S. at 267.  The Court ruled
that the stop and frisk in that situation was constitutionally
invalid.  It said that on those facts, "the officers' suspicion
that J.L. was carrying a weapon arose not from any observations
of their own but solely from a call made from an unknown location
by an unknown caller....  All the police had to go on ... was the
bare report of an unknown, unaccountable informant who neither
explained how he knew about the gun nor supplied any basis for
believing he had inside information about J.L."  Id. at 270-71.
The Court emphasized that "reasonable suspicion ... requires that
a tip be reliable in its assertion of illegality, not just in its

tendency to identify a determinate person," id. at 272, and it
rejected an "automatic firearm exception" to the reliability
analysis.  Id. at 272-74.

Justice Kennedy, joined by the Chief Justice in concurring
in J.L., stressed that the record in that case did not show
whether ... "some notation or other documentation of the call was
made either by a voice recording or tracing the call to a
telephone number.... [n]or do we know whether the dispatcher or
arresting officer had any objective reason to believe that this
tip had some particular indicia of reliability."  Id. at 275-76.
He suggested that other circumstances involving anonymous tips
might rise higher in the reliability analysis, such as where an
unnamed person driving a car stops police briefly and describes
criminal activity in person, thus placing his anonymity at risk,
or where instant caller identification followed by prompt police
response, or voice recording of tips, could be used to locate the
caller.  Id. at 276.

The Third Circuit rejected a Terry stop of a person in a
crowd at 9:00 a.m. at a Virgin Islands festival, based only on a
face-to-face anonymous tip pointing the person out and stating
that he had a gun.  In United States v. Ubiles, 224 F.3d 213 (3d
Cir. 2000), the informant did not state how he knew the
information, and the police observed nothing unusual or
suspicious in the person's behavior as they approached and spoke

21

with him.  There, the court concluded that because local law in
the Virgin Islands does not criminalize firearm possession in
public, unless it is unregistered or the like, and because
nothing in the tip or the circumstances gave police a basis for
reasonable suspicion of unlawful activity, the evidence must be
suppressed.  It stated:

> During the suppression hearing the Government adduced
> no evidence suggesting that either [the officer who
> made the seizure] or his officer confreres was aware of
> any articulable facts suggesting that the gun Ubiles
> possessed was defaced or unlicensed, that Ubiles posed
> a safety risk to the authorities or the [festival]
> celebrants, or that Ubiles was acting in a manner
> indicating that he was involved in a different crime.
> For all the officers knew, even assuming the
> reliability of the tip that Ubiles possessed a gun,
> Ubiles was another celebrant lawfully exercising his
> right under Virgin Islands law to possess a gun in
> public.

Id. at 218.

A Terry stop based on both victim and bystander information,
not of the anonymous variety, coupled with police observations on
the street, was held not to satisfy the Fourth Amendment in
United States v. Brown, 448 F.3d 239 (3d Cir. 2006).  In that
case a pedestrian walking in downtown Philadelphia one evening
was approached by two black male teenagers wearing dark clothing
who attempted to grab her purse, and when she resisted one of
them pointed a gun at her and then they fled on foot.  She called
911 moments later, recounting the location and events and giving
a general physical and clothing description of the suspects.  A

police officer arrived at her location and took a second
description, then relayed that over the police radio.  Minutes
later, a friend of the victim called the victim while she was
still with the police, and said he had just seen persons meeting
the description at a location three blocks away.  Police went to
that location and observed two black males with dark clothing
exiting a store with cups of coffee, walk across the street and
hail a taxi.  Those individuals were well past teenage years and
each had a full beard, and spoke normally with police when first
approached.  Yet the police stopped and frisked them, leading to
prosecution of one of them on a felon in possession charge.  The
Court held that the totality of the circumstances did not justify
a Terry stop, reasoning that the second-hand tip regarding
location of suspects, by the friend of the victim who had never
seen the suspects, did nothing to relieve the lack of specificity
in the description of the suspects by the victim, nor did any
observations of defendant and his companion by the police add
useful knowledge to their basis of information.  The physical
description was too general, and the defendant and his companion
did nothing to suggest suspicious behavior.  Nor was it a high
crime area or a late night situation.  The court concluded:  "We
are confident ... that in this case an excessively general
description, combined with an honest but unreliable location tip
in the absence of corroborating observations by the police, does
not constitute reasonable suspicion ...."  Id. at 252.

A wholly anonymous tip was rejected as sufficient to support a Terry stop in United States v. Roberson, 90 F.3d 75 (3d Cir. 1996), where a 911 call in the early evening stated that a heavy-set, black male wearing dark green pants, a white hooded sweatshirt, and a brown leather jacket was selling drugs on a certain city block, but the 911 operator had no information as to the reliability of the caller or the source of the information. Police went immediately to that location, which was known as a "hot spot" where drugs were sold to passing motorists, and saw a man meeting the tipster's description standing on the corner. They made eye contact with him, then defendant walked casually over to a parked car and leaned in as if to speak with the occupants, though no indicia of drug activity was observed by police.  The court based its decision on the facts that the police were "dealing with an anonymous and bare-bones tip, [from which] the police had no basis for assessing either the reliability of the informant or the grounds on which the informant believed that a crime was being committed....  [and] [t]hese omissions probably would not have invalidated the stop, if after corroborating readily observable facts, the police officers had noticed unusual or suspicious conduct on Roberson's part."  Id. at 80.  The court said that the fact that defendant was apprehended on a drug-dealing "hot corner" was not enough, adding that police could have acted on the tip by setting up

surveillance of the defendant.  Id. at 80-81.  It cautioned, however, that the circumstances of that case did not require it to decide "what corroborating factors would be required for an anonymous tip of gun possession to serve as the basis for reasonable suspicion, and leave that question for another day." Id. at 81 n.4.

Applying these principles to the case at bar, and based upon the factual findings we have made from the evidence in the record, we find that the totality of the circumstances did support the Terry stop of defendant in the green Ford that he was driving on the night of November 5, 2005.  We will discuss these facts under the factors identified in the case law discussed above.

Reputation of area for criminal activity

Police were well familiar with the location of the alleged crime, Dee Dee's Lounge at the corner of Brunswick Avenue and Chase Street in Trenton, New Jersey.  Officer Godbold described it as a neighborhood bar in an area that could be a rough neighborhood, where police had had to respond to various disturbances in the past.

Time of day

The 911 call was received by the police radio room at 1:49:44 a.m. on a Saturday morning.  This was a very late hour of the night (a Friday night).  In addition, it was approximately

25

ten minutes before bar closing time.  Police would be familiar with the Trenton city code requirement that the bars must close and all patrons must leave by 2:00 a.m.[15]  Thus, any patrons inside the Lounge would have been forced to exit onto the street as that hour approached.

<u>Geographical and temporal proximity of the stop to the scene of the alleged crime</u>

We do not have the tape recording of the 911 call, but as the radio room summarized the information given by the caller, a "male inside Green Ford Expedition pulled a gun," and the

---

[15]  The municipal code for Trenton, New Jersey, consistent with state law and regulation, provides in pertinent part:

<u>Opening and closing hours.</u>

A.  <u>Excluded hours of sale.</u>  No alcoholic beverages shall be sold, served, delivered or consumed, nor shall any licensee suffer or permit the sale, service, delivery or consumption of any alcoholic beverage, directly or indirectly, upon the licensed premises between the follwoing hours, prevailing time:
(1)  Weekdays, except January 1:  <u>2:00 a.m.</u> and 7:00 a.m.
(2)  Sundays, except January 1:  2:00 a.m. and 12:00 noon.
....
B.  <u>Closing of premises.</u>  No licensee shall permit any person, patron or customer to consume any alcoholic beverages upon the licensed premises during the hours when the sale, delivery, service or consumption of alcoholic beverages is forbidden.  During such hours the licensed premises ... shall and must remain closed and locked to all persons except for employees who clean or perform other necessary work in and about the premises during such prohibited hours, and <u>no person other than such employees shall be permitted to remain on the premises.</u>

Trenton, N.J., Code § 10-5 (emphasis added).

location was Dee Dee's Lounge.  Police could reasonably infer from that message, coming in on a 911 line, that a crime in the nature of assault or terroristic threat had just occurred, and that further criminal activity involving a man with a gun could be in progress at that time.  Police arrived at the designated location within approximately two minutes after receiving the 911 call.  The <u>Terry</u> stop was made within approximately two more minutes at a location approximately three blocks from the bar, to which officer Godbold followed the Ford without losing sight of it for an instant.  Thus, there was both temporal and geographical proximity of the stop to the scene of the alleged crime, whether viewed as a completed crime or one still in progress when the police arrived at the bar.

<u>Number of persons in the area</u>

The record does not indicate that there were other persons in the street scene that Godbold first observed upon arriving at the corner where the bar was situated.  What he did observe was the one occupied vehicle, consisting of a green Ford Expedition exactly meeting the description of the 911 call.  Also, upon Godbold's arrival there in a marked police vehicle, he observed an "older black gentleman" who came out of the bar and communicated with him by a pointing gesture and words that Godbold could not hear.  Thus, the only persons described in the scene could reasonably be understood to be relevant to the officer's response to the dispatch call.

27

Identity of informants

There were actually two informants in the sequence of events as depicted in the evidence.  The first was the 911 caller.  The Call Taker did not obtain her name, but did obtain her cell phone number as the call came into the police station.  The Call Taker would have known that the caller was female, because he heard her voice on the phone although the tape recording is no longer available.  The summary of the 911 call, as typed by the Call Taker, indicated that the call was by someone who at a minimum witnessed the suspect "pull a gun," and was likely the victim. These indicia of the identity of the caller would have afforded police some opportunity to find her if the tip did not pan out or if it became necessary to identify her as a victim or witness in a legal proceeding.

The other informant was in the nature of a bystander.  He was not a telephone caller, but rather a face-to-face informant. Officer Godbold could see exactly what he looked like, and where he came from (a neighborhood bar) at that exact moment (approximately 1:50 a.m. on Saturday morning) when he initiated contact with the police.  Those facts provided ample indicia of identity such that the police would likely be able to find and identify him in a further investigation.[16]

---

[16] Defense counsel called as a witness at the evidentiary hearing the federal case agent in this matter, and was permitted to question him as if on cross-examination.  He testified that in

Timing, quality and content of the information from informants

The timing of the 911 call indicated both immediacy and urgency to the situation described.  In addition, the timing and setting of the bystander's information was supportive of a reasonable inference that criminal activity was both fresh and possibly ongoing.  It reasonably would indicate to the responding officer, Godbold, that the bystander was aware of a current disturbance and had information that the person or persons responsible were in the occupied vehicle opposite the side door of the bar at that moment.

It is true that the content of the 911 call did not provide any physical description of the suspect.  But the description of the vehicle was exact (green Ford Expedition); the location was exact (Dee Dee's Lounge); the timing was exact (in said vehicle at said location); and the conduct described was definitely criminal.  It is also true that the 911 call did not predict future conduct of the suspect, as has been held to provide

---

preparation for the upcoming trial, he recently went to Dee Dee's Lounge and interviewed the person whom the Trenton police did identify post-arrest as that male informant.  (Tr. 15 at 105-08.) That person was named in Godbold's investigation report as the owner of the bar.  (Exh. D-1 at 2-3.)  The person indicated to the agent that he would not testify at trial, and denied that he pointed at any vehicle on the night of this arrest.  The government brought out that the agent learned from that individual that he was frightened at the time of the event on November 5, 2005, because he had problems at the bar in the past, and he would not come to court to testify because he was frightened to do so.  (Tr. 15 at 108-11.)

reasonable suspicion on the basis of a truly anonymous call alone
if sufficiently predictive and corroborated by police
observations.  <u>See, e.g.</u> <u>Alabama v. White</u>, 496 U.S. 325 (1990).
But in this case the anonymous caller was not truly anonymous, as
we have seen.  Moreover, in our view the timing, quality and
content of her communication to the police, along with that of
the communication from the bystander, are factors weighing
heavily in the analysis.

<u>Any exigent circumstances at the time</u>

The hearing evidence was strong to the effect that any 911
call of a "man with a gun," even if not accompanied by the
feature that this caller reported that the man had pulled the
gun, will set up an emergent response on the part of the police.
Officer Godbold testified, as corroborated by Sergeant Gonzales
and dispatcher Kramarz, that it is typical for numerous police
units to respond when a "man with a gun" dispatch is issued.
This is for the protection of the officers, as well as the
obvious need to protect the community.

The speed with which this 911 call was processed, dispatched
and responded to in the field demonstrates the emergent nature of
the situation.  The fact that the suspect was described as being
in a vehicle surely contributed to that exigency, not only
because being in a vehicle would have afforded a would-be gun
wielder or shooter concealment and cover, but because it would

have facilitated a rapid escape.  In those circumstances, it was not unreasonable for the police officers to absorb the information offered by the informants and assess it in light of their own in-person observations, without pausing to try to identify and interview the informants in more detail at that moment.

Behavior of defendant when police came into his vicinity

Officer Godbold testified that as soon as he arrived at Dee Dee's Lounge, he saw that a green Ford Expedition described in the radio dispatch was exactly where it was described to be. Indeed, he observed that the Ford was positioned opposite the side entrance of the bar.  He next observed two events that he described as occurring almost simultaneously:  a man emerged from the bar and pointed at the Ford, and the Ford moved out of its stationary position and began driving away.  We do not know whether the driver of the Ford saw the bystander point and attempt to communicate with the police car, but we can infer that at a minimum, the driver was aware that a police car had just arrived.  Lawful conduct such as driving away upon the arrival of a marked police squad car would not alone be sufficient to support a Terry stop, but it is relevant in assessing the objective reasonableness of what a trained officer would conclude from all the facts known to the police, including personal observations.  Here, we find that a reasonable police officer

31

could infer that the lawful, seemingly innocent act of driving away when the police car arrived, in this case, was further supportive of the totality of information available to the police in deciding to conduct a brief investigative Terry stop.

*     *     *

We find that the totality of the circumstances in this case support the conclusion that at the time the police stopped defendant's vehicle on Nassau Street in Trenton at approximately 1:53 a.m. on November 5, 2005, the police did have a reasonable, articulable suspicion that at least one of the occupants of that vehicle was engaged in criminal activity involving a gun.  The basis of knowledge included the information provided by the 911 caller, as well as the awareness that the caller's cell phone number was available; it included the knowledge of the area as potentially "rough," with prior disturbances at that location, and the lateness of the hour and the imminence of closing time at the bar; it included the communication directed to the arriving police officer by the bystander; and it included the observations of the officers at the scene when as they arrived, the vehicle described by the 911 caller started to drive away from the location where it had been positioned.  Based upon all of the cumulative information available to the police at that time, viewed through the lens of a trained law enforcement officer rather than a lay person, we find that the Terry stop of

32

defendant and his vehicle was based upon objectively reasonable suspicion and therefore was constitutionally valid under the Fourth Amendment.  As the Third Circuit commented in <u>Valentine</u>, having performed the fact-specific analysis necessary there:

> The constellation of likely criminal acts in a high-crime area at 1:00 a.m. goes well beyond simply carrying a gun without registration or with altered serial numbers.  Indeed, given the large number of potential crimes and the danger posed by an armed criminal, we think that if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss. People who live in communities torn by gunfire and violence are entitled to be free from fear of victimization and have police investigate before shootings occur.  As the Supreme Court said in <u>Wardlow</u>, when police learn of potentially suspicious conduct, officers can stop and question the suspects to resolve ambiguity about the suspects' conduct.

<u>Valentine</u>, 232 F.3d at 356 (summarized <u>supra</u>, nn. 11, 14).

Based upon these rulings, we conclude that the officers acted properly in removing both occupants from the Ford and frisking them for the presence of any weapons.  The Supreme Court held in <u>Pennsylvania v. Mimms</u>, 434 U.S. 106 (1977), that police may order persons out of an automobile even during a traffic stop for a traffic violation, and may frisk those persons for weapons if there is a reasonable belief that they are armed and dangerous.

We further conclude that the subsequent search of the interior of the Ford was lawful either as incident to the lawful <u>Terry</u> stop of the vehicle, or as a result of the observation and recovery of the holster (exh. G-3) by officer Godbold.  <u>Terry</u>

33

permits the police officer to frisk for weapons for his own protection "where he has reason to believe he is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27.  In Michigan v. Long, 463 U.S. 1032 (1983) the Supreme Court extended Terry to rule that "the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons," such as when he will re-enter the vehicle.  Id. at 1049-51.  We also find, based upon the hearing record which we find to be credible, that after Officer Godbold lawfully removed the passenger from the Ford during the Terry stop, he observed in plain view the shoulder holster (exh. G-2) on the floor on the passenger side.  This discovery justified the warrantless retrieval of the holster.  Horton v. California, 496 U.S. 128, 136-37 (2000).  Coupled with all of the knowledge of the police up to that point, it also gave rise to probable cause to search the passenger compartment of the vehicle for weapons, resulting in the discovery of the gun, magazine and ammunition.  (Exhs. G-3A, G-3B, G-3C.)  See Carroll v. United States, 267 U.S. 132, 153-54 (1925).

34

Finally, we rule that defendant's statements to the police shortly after the recovery of the firearm were not obtained in violation of his Fifth Amendment right against self-incrimination, or of his rights under Miranda.  We find that defendant's statements immediately after the police recovered the gun from the Ford were made in the absence of any questioning by the police.  We need not determine whether defendant was "in custody" at the time he made those statements, because they were not the product of any police interrogation.  See United States v. Fioravanti, 412 F.2d 407, 413-19 (3d Cir. 1969) (Miranda cannot apply to a situation where one who is not under the stress of interrogation simply volunteers a statement).

This Court holds that the physical evidence and the statements made by the defendant, which are the subject of defendant's motion to suppress, were obtained by law enforcement without violation of defendant's constitutional rights.  Therefore, the motion to suppress must be denied.  For the same reasons, the motion to dismiss the indictment will be denied.


      s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge